IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:19-cr-84 |
| Plaintiff, | : | Judge Susan J. Dlott |
| v. | : | **ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE** |
| MARKEITH FORD, | : | |
| Defendant. | : | |

This matter is before the Court on Defendant's Motion to Suppress Evidence (Doc. 26). The United States opposes the motion (Doc. 30). The Court conducted an evidentiary hearing on February 3, 2021. With permission of the Court, the parties filed post-hearing briefs (Docs. 42, 43), and this matter is now ripe for adjudication.

Cincinnati Police Department ("CPD") officers arrested Defendant Markeith Ford on April 24, 2019, and a grand jury indicted him on a single charge of possession of a firearm by a prohibited person, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Ford contends that he was arrested in violation of the Fourth Amendment to the Constitution, and he seeks to suppress all evidence obtained in connection with his arrest, including the firearm. For the reasons that follow, Defendant's motion will be **DENIED**.

I.   **BACKGROUND**

On April 24, 2019, CPD Officer Brendon Rock was conducting remote surveillance of certain high crime areas through the use of pole cameras. He observed a person with what appeared to be marijuana, and he relayed the information, including the location and suspect's description, to officers in the area for investigation. CPD Officer Carl Beebe received Rock's

1

radio communication, and Beebe and another CPD officer responded to the call. The other officer drove a marked police cruiser with Beebe in the front passenger seat.

When the cruiser pulled up to the suspect now known to be Defendant Markeith Ford, Beebe immediately exited the vehicle. Ford saw him and took one hesitant step backward before turning and quickly running away. Beebe ran after him. Ford ran up Vine Street, through an alley, and then turned left onto East McMicken Avenue with Beebe in foot pursuit.

While they were running through the alley, Beebe saw Ford reach into his back waistband. He communicated to other officers that Ford had something in his hand. Beebe testified that when Ford turned onto McMicken Avenue, Beebe lost sight of him briefly but heard a distinctive "kind of metallic clink . . . consistent with semi-automatics" that he believed "was the sound of a gun hitting something." (Doc. 39 at PageID 326.) Ford scaled the fence surrounding a community garden on McMicken Avenue. Once inside the community garden fence, Ford stopped running and surrendered.

While Beebe pursued Ford on foot, other officers drove marked police cruisers to East McMicken Avenue. CPD Officer Ashley Jenkins, dressed in plain clothes but wearing a police vest, arrived at the scene, but other officers already were taking Ford into custody. While arrangements were being made to cut the fence so Ford could be removed from the community garden, Jenkins and other officers checked the area for the item Ford allegedly threw while running from Beebe.

Jenkins saw a firearm in plain view on East McMicken Avenue next to the curb between the alley and the fence into the community garden. (Doc. 39 at PageID 362–363.) She photographed the weapon, and another officer put on fresh gloves and secured the firearm. A

2

pole camera on McMicken Avenue recorded video throughout the chase, but a yellow construction dumpster blocked the camera view of the item Ford threw.

Officers transported Ford to the police station and placed him in an interview room. When Jenkins and another CPD officer entered the interview room, Jenkins asked if he had been Mirandized. He said he had not. Jenkins then orally read him his rights, and Ford signed a written notification of rights form (Gov't. Exh. 4).

After signing the form, Ford submitted to questioning. On video admitted as Government Exhibit 3, Ford denied possessing or throwing a firearm during the foot chase. (Gov't. Exh. 3 at 2:55 to 3:12.) He indicated that he ran from Beebe because he possessed marijuana. He admitted to "tossing weed" and indicated that he tried to get rid of the "weed" earlier but he was unable because "it was in [his] drawers." (*Id.* at 6:20 to 6:50.)

Ford initially moved to suppress all evidence obtained in this case, including the firearm, ammunition, post-arrest statements, and DNA evidence due to alleged Fourth and Fifth Amendment violations. (Doc. 26 at PageID 119.) The United States opposed the motion. (Doc. 30.)

During the evidentiary hearing on Ford's Motion to Suppress, the Government offered into evidence DVDs of the pole cam video footage (Gov't. Exh. 5), Beebe's body cam footage (Gov't. Exh. 1), and the police interview of Ford (Gov't. Exh. 3). The Court admitted these exhibits into evidence without objection. (Doc. 39 at PageID 327 and 367.)

In his Post-Hearing Brief, Ford withdrew his Fifth Amendment argument and claimed that such withdrawal rendered Government Exhibit 3 irrelevant to the suppression analysis. (Doc. 42 at PageID 389–90 and n. 1.) The Government filed a Response to Defendant's Post-Hearing Brief (Doc. 43).

## II. REASONABLE SUSPICION AND PROBABLE CAUSE TO ARREST

Ford contends that no reasonable suspicion supported conducting his investigative stop. Ford further contends that seizure occurred, albeit briefly, when Beebe arrived and instructed Ford not to run.

The Government contends that Rock's pole camera observations provide reasonable suspicion that Ford possessed marijuana. The Government also argues that Ford was not seized until he submitted to police authority, and at that point, officers also had probable cause to arrest him for obstructing official business by fleeing their investigation. For the reasons that follow, the Court agrees with the Government.

### 1. Point of Seizure[1]

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. This protection extends to all seizures, including investigatory *Terry*[2] stops, which occur if an officer has "reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010) (citing *United States v. Place*, 462 U.S. 696, 702 (1983)).

Fourth Amendment protections are not triggered until a person is "seized," or when an officer has in some way restrained the defendant's liberty by means of physical force or show of authority such that a reasonable person viewing all the circumstances surrounding the incident would not believe he is free to leave. *Id.* (citing *Terry*, 392 U.S. at 19 n.16; *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)). An individual must *actually yield* to the show of

---

[1] Both the Government and Defendant refer to this Court's recent opinion in a similar case involving the same attorneys, *United States v. Maull*, No. 1:20-cr-11, 2020 WL 4753028 (S.D. Ohio August 17, 2020). As the Court agrees that case accurately summarized the applicable case law, the Court will repeat much of that summary here.
[2] *Terry v. Ohio*, 392 U.S. 1 (1968).

4

authority to be seized within the meaning of the Fourth Amendment. *Id.* (citing *Brendlin v. California,* 551 U.S. 249, 254 (2007)). It is well-established that a reasonable person does not yield until he complies with officers' orders to stop. *Id.* at 691.[3] Where officers apply physical force with intent to restrain, a seizure occurs even without submission, but that seizure "lasts only as long as the application of force." *Torres v. Madrid,* ___ U.S. ___, ___, 2021 WL 1132514, at *7 (March 25, 2021).

Ford alleges that he was seized, for Fourth Amendment purposes, when he "kind of froze" and "kind of stood up" as uniformed Officer Beebe alighted from the marked police car, approached him, and stated, "Oh, you're not going to do that." (Doc. 39 at PageID 316.) According to Ford, his momentary hesitation before taking flight constitutes seizure, albeit a brief one, because a reasonable person would not feel free to leave under those circumstances. (Doc. 42 at PageID 393.)

Although a reasonable person may not feel free to leave under those circumstances, Ford clearly felt free to leave and did, in fact, flee the scene. Beebe testified that Ford immediately demonstrated "preflight indicators." (Doc. 39 at PageID 316.) According to the pole cam video,[4] the lights from Beebe's police car were first visible at 7:13:42 p.m. (Gov't. Exh. 5 – Vine at 7:13; Doc. 39 at PageID 342–43.) At 7:13:43 p.m.—just one second later—Ford turned to run, and he was no longer visible on the Vine Street video cam by 7:13:45. (Gov't. Exh. 5 – Vine at 7:13 to 7:14 p.m.) Beebe first appeared at 7:13:46, in foot pursuit of Ford who fled in the opposite direction. (Gov't. Exh. 5 - Vine at 7:13:45 to 7:14:47 p.m.)

---

[3] In *Johnson*, the Sixth Circuit found that a reasonable person would not feel free to leave where two officers arrived in marked police cars, announced themselves as police several times and yelled at the defendant to "stop" and "stay right there where he was" as they advanced towards him. *Johnson,* 620 F.3d at 691. Only when the defendant complied with the officers' orders was he "seized" for Fourth Amendment purposes. *Id.*

[4] Government Exhibit 5 contains two pole cam videos running side by side at the same time. One camera view is marked "1646 Vine at Green – Camera 1" while the second view is marked "80 E McMicken at Lang." In the interest of brevity, the Court will refer to these videos as "Gov't. Exh. 5 – Vine" and "Gov't. Exh. 5 – McMicken," respectively.

5

As the pole cam video established, Ford did not, in fact, submit to Beebe's authority. Rather, Ford ran from Beebe immediately until he surrendered approximately two blocks later inside the community garden on East McMicken Avenue. (*Id.* at 7:13 to 7:14; Government Exh. 5 – McMicken at 7:14:06 to 7:15; Doc. 39 at PageID 314, 316–17, 321–25.) Accordingly, Ford was not seized until he submitted to authorities in the community garden.

### 2. Reasonable Suspicion

"The Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Navarette v. California*, 572 U.S. 393, 396–97 (2014) (citing *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). "The 'reasonable suspicion' necessary to justify such a stop 'is dependent upon both the content of the information possessed by police and its degree of reliability.'" *Id.* (citing *Alabama v. White*, 496 U.S. 325, 330 (1990)). "The standard takes into account the totality of the circumstances—the whole picture." *Id.* (citing *Cortez*, 449 U.S. at 417.) Although a "hunch" is insufficient, the level of suspicion required to establish reasonable suspicion is less than that required for probable cause. *Id.* (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

Reasonable suspicion for an investigative stop need not be based upon the officer's personal observation and can be based on information supplied by another. *Id.* at 397. Reasonable suspicion requires that the law enforcement officers detaining a person have a "particularized" basis for suspecting that person of criminal activity based on "specific, objective facts." *United States v. Johnson*, 620 F.3d 685, 692 (6th Cir. 2010) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981) and *Brown v. Texas*, 443 U.S. 47, 51 (1979)). In evaluating reasonable suspicion, courts "must permit officers to make 'commonsense judgments

and inferences about human behavior.'" *Kansas v. Glover*, ___ U.S. ___, ___, 140 S.Ct. 1183, 1188 (2020) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)). Furthermore, the officer "need not rule out the possibility of innocent conduct." *Id.* (quoting *Navarette*, 572 U.S. at 403); *United States v. Howard*, 815 F. App'x 69, 76 (6th Cir. 2020). "[I]f officers have reasonable suspicion that an individual has committed or is committing a crime, and when approached by officers the individual flees or attempts to flee, the reasonable suspicion 'ripens' into probable cause." *United States v. Williams*, 475 F. App'x 36, 39 (6th Cir. 2012) (quoting *United States v. Dotson*, 49 F.3d 227, 230–31 (6th Cir. 1995)).

On April 24, 2019, Rock observed via pole cam Markeith Ford in possession of what he believed to be marijuana, and he communicated that information as well as the suspect's exact location and description to Beebe. (Doc. 39 at PageID 311.) As the pole cam footage confirms, Ford pulled a brown cylindrical object from his pocket, licked the length of it, replaced something that stuck in his mouth when he licked it, licked it again, lit it, smoked it, and offered it to an apparent friend to smoke, too. (Gov't. Exh. 5 – Vine at 7:06:57 to 7:11:30.) The pole cam zoomed in on the object in Ford's hand, and it does not appear to be—as Defendant suggested at the hearing—a cigar[5] or an e-cigarette. (*Id.* at 7:07:14 to 7:08:26; Doc. 39 at PageID 315.) It possibly could be a tobacco cigarette rolled in brown paper, but the officers need not rule out the possibility of innocent conduct in determining reasonable suspicion.

Based on the pole cam observations, Rock had specific, objective facts to support his reasonable suspicion that the suspect now known to be Markeith Ford possessed marijuana, and he asked Beebe to investigate that reasonable suspicion. (Doc. 39 at PageID 314–316, 319.) When Beebe attempted to investigate, Ford fled the scene with Beebe in pursuit. (*Id.* at PageID

---

[5] Defendant suggested at the hearing that it could be a "Black and Mild," a type of thin cigar. Even if it were a cigar, Beebe testified that people commonly replace legal tobacco with marijuana. (Doc. 39 at PageID 357–358.)

7

316–317, 321–323.) As Ford ran, Beebe's reasonable suspicion ripened into probable cause that Ford was obstructing the drug possession investigation and possibly possessed an illegal weapon. (*Id.* at PageID 322–326.) Thus, when officers finally seized Ford in the community garden, they had probable cause to arrest him.

### III. SUPPRESSION OF THE GUN FOUND ON MCMICKEN AVENUE

Even if officers lacked probable cause to arrest Ford, the weapon found in plain view on McMicken Avenue need not be suppressed. The Fourth Amendment is not implicated where the person seeking suppression has no reasonable expectation of privacy in the property he seeks to suppress. *United States v. Mathis*, 807 F. App'x 476, 478 (6th Cir. 2020) (denying suppression of evidence found in garbage bags put out for collection). When a person disclaims ownership of an item, he "has no legitimate expectation of privacy in the item." *United States v. Dillard*, 78 F. App'x 505, 510 (6th Cir. 2003); *United States v. Frazier*, 936 F.2d 262 (6th Cir. 1991). Indeed, even where a person possessed a weapon but threw it while being pursued by police officers, the person "abandoned his pistol—and therefore any expectation of privacy that he had in it—when he threw it." *United States v. Matthews*, 689 F. App'x 840, 843 (6th Cir. 2017).

In the case at bar, police officers located the gun Ford seeks to suppress laying in plain view on McMicken Avenue. Ford—on video after signing a notification of rights form—denied owning or possessing the firearm. (Gov't. Exh. 3 at 2:55 to 3:12.) The Government contends that Ford possessed the gun but threw it while attempting to evade Beebe. Either way, Ford lacks any expectation of privacy in the abandoned weapon, so its collection and testing do not implicate Ford's Fourth Amendment rights.

8

IV. **CONCLUSION**

For the reasons set forth above, Defendant Markeith Ford's Motion to Suppress Evidence (Doc. 26) is hereby **DENIED**.

**IT IS SO ORDERED**.

Dated: April 5, 2021

                                                         Judge Susan J. Dlott
                                                         United States District Court